### NATIONAL LABOR RELATIONS BOARD v. REEVES RUBBER CO.

No. 11055.

Circuit Court of Appeals, Ninth Circuit.

Jan. 28, 1946.

David A. Morse, Gen. Counsel, NLRB, A. Norman Somers, Asst. Gen. Counsel, and Marcel Mallet-Prevost and Eleanor Schwartzbach, Attys., NLRB., all of Washington, D. C., for petitioner.

Wright & Millikan and Herschel B. Green, all of Los Angeles, Cal., for respondent.

Before MATHEWS, STEPHENS, and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

In opposition to the National Labor Relations Board's petition for the enforcement of its order to respondent Reeves Rubber Company, the latter interposes three reasons why, in its view, this court should deny the petition. They are as follows:

1. The Board's findings of fact that respondent has engaged in and is engaging in unfair labor practices in violation of § 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), are not supported by substantial evidence.

2. The record conclusively shows that Jacob Horn was discharged for poor workmanship and carelessness rather than because of his membership and activities in behalf of the union.

3. The Board's order is unlawful.

We think the three points may be treated without strictly separating them.

The Board's order is that respondent cease and desist from "(a) Discouraging membership in United Rubber Workers of America, affiliated with the Congress of In-

dustrial Organizations, or in any other labor organization of its employees, by discharging or refusing to reinstate any of its employees, or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment; (b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist United Rubber Workers of America, affiliated with the Congress of Industrial Organizations, or any other labor organization, to bargain collectively through representatives for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act." The affirmative requirements of the order need not be set out in full, for it is sufficient to say that they are to reinstate Jacob Horn, a discharged employee, make him whole as to pay and position, post certain notices, and notify the Regional Director as to steps taken in compliance with the order. No part of the order has been complied with.

The evidence is very conflicting as to conversations had between Jacob Horn, employee, and L. D. Snow, secretary of the employer-company, who appears to be given considerable executive authority. It is not disputed, however, that Horn did talk with Snow on three or four occasions about the unionization of the plant.

According to Horn's version of the conversations, Snow was very much against unionization and suggested that, instead of organizing in a union, they (employees) organize "a little club," stating that unions (evidently referring to nationally organized unions) were composed of racketeers and that Horn should see President Reeves of the company before going to Los Angeles to enlist the aid of the union there in organizing the Reeves employees. It appears that the two went to Reeves' office, but they did not see the President, for, after some time waiting, Mr. Reeves was reported as busy.

Horn went to Los Angeles for the purpose mentioned, and the day thereafter, January 16th, President Reeves expressed a wish to see him. Horn, Andrew Stiller, day-shift foreman, and Reeves met, and Horn gave the other two some union literature. Horn testified that Stiller said he knew about Horn's Los Angeles visit and he was surprised; that after Horn's union experience elsewhere, he should know better than to attempt to unionize the plant;

that Reeves had moved to San Clemente to get away from unions, which were run by racketeers; that Reeves had said he would sell the plant if the unions came in; that all of such was also declared by Reeves at the meeting; that Reeves in addition declared the plant "would be run by Negroes from Los Angeles and Mexicans from San Juan Capistrano" if it were unionized; that respondent would have no choice in the selection of its employees; and that if the employees would set up a grievance committee of their own, he (Reeves) would be glad to interview anybody in his office at any time.

There is other evidence along the same line relevant to the affirmative opposition of respondent of the unionization of the employees.

Horn testified that on January 30th, conditions in the plant having gone from bad to worse, he solicited and obtained from employees twenty-one applications to join the union. Thereafter, he continued to solicit and receive applications. On February 1st Snow criticized Horn and, among other things, said he "couldn't understand why [Horn] wanted to bring the union in to tell Doc Reeves [President Reeves] how to run his business." On February 2nd Horn was discharged.

There is testimony that President Reeves continued thereafter to discourage the unionization of the plant in much the same manner as has already been set out. There is testimony on behalf of respondent, denying much of the testimony above set out and giving a very different trend to the conversations of Snow, Stiller and Reeves.

On the day of his discharge, Horn testified, Stiller accused him of failing to put sulphur in a batch of rubber stock and of failing to mill any kidney coupling stock the previous night; that Stiller informed him that President Reeves had ordered his discharge because of unsatisfactory work, drinking on the job, and fraternizing with women.

There is testimony which throws doubt upon the charge that Horn was responsible for the oversight in the work above mentioned; that the drinking on the job consisted of opening a bottle of beer on two occasions; and that Horn and Stiller had come to the plant on one occasion after having been drinking at a party in Horn's home. There is also testimony as to Horn's good workmanship.

In respondent's brief, there are several significant expressions. One is that "Mr. Snow's testimony as to what was said in the conversation [while Snow and Horn were waiting in Reeves'. office] appears to be more logical"; another is that "Mr. Snow denied making the statements to Horn that he was against unions; that the employees should form their own club; that unions were racketeers; and that he would have to use his position to fight any proposed union"; and again, that "The question now arises, which evidence is more probable and creditable?" Here is a direct appeal to us to weigh the evidence.

■ We quote the last paragraph of respondent's argument: "Had the Board seen fit to weigh and consider the evidence in this case as a whole, and given proper weight to all the testimony instead of emphasizing the Board's testimony and minimizing and discrediting the Respondent's evidence, justice would have impelled it to have reached a different conclusion in this case." It may be seen that the quoted paragraph is to the effect that if the Labor Board had taken the "overall view" or had weighed and considered the evidence, as a whole, and had given proper weight to all the testimony, a different conclusion would have been reached. It is perfectly reasonable that respondent, believing in the righteousness of his case, should hold to such view, and it would be an important and a legitimate argument to us if we possessed the jurisdiction to review the whole case with the purpose in mind of determining whether or not substantial justice has been decreed by the Board's order. We can do no better in treating this phase of the case than to reaffirm our expressions in National Labor Relations Board v. Walt Disney Productions, 9 Cir., 1945, 146 F.2d 44, 47, certiorari denied April 23, 1945, 324 U.S. 877, 65 S.Ct. 1025.

Respondent quite heavily relies upon expressions in our opinion in National Labor Relations Board v. Union Pacific Stages, 9 Cir., 1938, 99 F.2d 153, as authority upon the thesis that we have a very broad duty of considering and weighing the ultimate comparative sum total of all of the evidence. What we said in that case relative to the point is worthy of repetition here, and we reaffirm it. We quote from page 177 of 99 F.2d: "The Board vaguely sanctioned certain statements of evidence by mingling them with its findings, without noting, as we have pointed out, that. this evidence had been changed or modified upon cross-examination, or shown to be incorrect by other admitted or established facts. From a careful consideration of all the evidence the Court is satisfied that there is no substantial basis for the finding that the drivers were discharged because of their union activities." The posture of the evidence in the cited case readily distinguishes it from the instant one.

■ It would serve no purpose to collate the unbroken line of expressions by the Supreme Court of the United States and every one of the United States Circuit Courts of Appeals, including this circuit, that the Labor Board tries the facts and the reviewing court goes into facts only to find whether or not, as a matter of law, there is substance to the evidence upon which the Board has made its findings. Indeed it is so provided in the Labor Act § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e).

■ In the instant case there is quantity enough of relevant and competent evidence, if believed, to support the Board's findings. The Board's findings are conclusive to the effect that it did believe such evidence. Unless the evidence is so improbable upon its face as to negative belief or so inconsistent as to destroy its credence, no error of law can be decreed by this reviewing court. The evidence given in the case upon which the Board based its findings cannot be characterized as either improbable beyond belief, or inconsistent to the point of destroying its credence.

■ As to the extent of the cease and desist part of the order, it will be seen by relating the evidence to each separate right of the employee as specified in the order that there is no right mentioned which is not violated. For example, the Board found from substantial evidence that respondent "discouraged membership in United Rubber Workers of America", a right guaranteed by § 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. It then proceeds to extend the cease and desist provisions by adding the phase, "any other Labor organization." In this respect we think the order is unlike that in the recent cases decided by this court, National Labor Relations Board v. Kinner Motors, Inc., Dec. 29, 1945, 152 F.2d 816, and National Labor Relations Board v. Van de Kamp's Holland-Dutch Bakers, Inc., Jan. 7, 1946, 152 F.2d 818, which conform to the case of

National Labor Relations Board v. Express Publishing Company, 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. It is more like the early case of National Labor Relations Board v. National Motor Bearing Co., 9 Cir., 1939, 105 F.2d 652, and comes under the doctrine expressed in May Department Stores Co. v. National Labor Relations Board, 1945, 66 S.Ct. 203, 213, wherein it is indicated that the omnibus cease and desist order will be approved where there is a "clear determination by the Board of an attitude of opposition to the purposes of the Act to protect the rights of employees generally."

The Board's order is ordered enforced.