NATIONAL LABOR RELATIONS BOARD
v. CONOVER MOTOR CO.

NATIONAL LABOR RELATIONS BOARD
v. PHELPS BROS. SERVICE.

NATIONAL LABOR RELATIONS BOARD
v. STRANG GARAGE CO.

Nos. 4286–4288.

United States Court of Appeals
Tenth Circuit.

Nov. 5, 1951.

Owsley Vose, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Norton J. Come, and Nancy M. Sherman, Washington, D. C., were with him on the brief), for petitioner.

Thomas M. Burgess, Colorado, Springs, Colo., for respondents.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

Pursuant to the usual statutory proceedings under Section 10 of the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., the National

Labor Relations Board found that the Conover Motor Company, the Phelps Brothers Service Company and the Strang Garage Company, have refused and are refusing to bargain collectively with the certified representatives of their employees in violation of Section 8, subsection (a) (1) and (5) of the Act; that such unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act, and entered the usual cease and desist orders. Each of the respondents has refused to comply on the grounds that its activities do not affect commerce, and the Board is therefore without jurisdiction.

The sole question on this petition for enforcement is whether the respondents, and each of them individually, as retail dealers of new automobiles, are engaged in a business affecting commerce within the meaning of the Act. Each respondent admits that if its business is subject to the Act, the International Association of Machinists is the appropriate statutory bargaining representative of their mechanics, mechanic helpers, apprentices, body mechanics, metal men, painters, trimmers, polishers and lubricators, and that their refusal to bargain with such representative constitutes an unfair labor practice under the Act.

The respondent, Conover Motor Company, sells services and repairs automobiles in Colorado Springs, Colorado. Its sales of new automobiles are made in accordance with an agreement with the Chrysler Corporation, giving Conover exclusive rights for the sale of Chryslers in El Paso County, Colorado, and nonexclusive rights for the sale of Plymouths.

During 1949, Conover purchased Chrysler automobiles at a total cost of $108,808.88, and Plymouth automobiles at a total cost of $140,991.35, all of which were shipped to it from outside the state of Colorado. During the same year it purchased directly from suppliers located outside Colorado, Chrysler and Plymouth parts totalling $6,731, and purchased from Colorado suppliers, parts manufactured outside the state, totalling $40,225.66. Conover's total receipts during the year 1949, all of which were derived from sales and services performed within the State of Colorado, amounted to $615,369.86.

Phelps Brothers Service Company, like Conover, sells, services and repairs automobiles in Colorado Springs. It operates under a dealer's franchise issued by the Nash-Kelvinator Corporation, with the exclusive right to sell Nash automobiles in El Paso County, Colorado. During 1949, Phelps purchased new Nash cars valued at $174,109.26; accessories attached thereto valued at $21,325.80 and Nash parts valued at $28,432.37. The new cars were ordered by Phelps through the manufacturer's zone office in Denver, but most of the orders were filled by shipment from Kenosha, Wisconsin. The parts, although obtained from the Nash Warehouse in Denver, were manufactured in Milwaukee, Wisconsin. During 1949, Phelps' total receipts, all derived from sales and services performed in Colorado, amounted to $416,423.34.

The Strang Garage Company operates a retail automobile agency and general garage and automobile repair business in Colorado Springs. It sells Buicks and GMC trucks under contracts with General Motors Corporation, giving it the exclusive right to sell GMC trucks and Buicks in El Paso County, Colorado, and nonexclusive rights to sell these vehicles in adjacent Teller County. In 1949, Strang ordered, through General Motor's Branch Office in Denver, new Buicks valued at $354,664.30. These new cars, although billed to the General Motors Acceptance Corporation, were shipped by the manufacturer from Kansas City, Missouri, and Flint, Michigan, directly to Strang's place of business. During the same period, Strang ordered from General Motors' Denver Office, GMC trucks valued at $44,111.80, which were delivered by transport to Strang from the manufacturer's factory at Pontiac, Michigan, or from the assembly plant at St. Louis, Missouri. Strang also purchased directly from suppliers located outside the State, car accessories valued at $41,502.64 and Buick parts valued at $19,786.00. In 1949 the total value of shipments to Strang from points outside Colorado exceeded $460,000, and it in turn sold wholly within the state,

automobiles, trucks, accessories and parts valued at $1,063,893.13.

Strang is also engaged in the sale of home appliances and in 1949 sold within Colorado, appliances valued at approximately $220,000. The Frigidaires so sold, although obtained from Frigidaire's Branch Office and Warehouse in Denver, were manufactured in Dayton, Ohio.

■ The question of whether the respondents' business activities are wholly intrastate, interstate or a combination of the two is not decisive of the Board's jurisdiction under the Act. The incidence of the Labor Management Relations Act is not restricted to interstate transactions. In exercising the full sweep of its constitutional authority to prevent the harmful effects of industrial strife on interstate commerce, the Congress extended the scope of the Act and the Board's jurisdiction over all activities adversely affecting the full flow of interstate commerce. N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; N. L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Polish National Alliance v. N. L. R. B., 322 U.S. 643, 64 S.Ct. 1196, 88. L.Ed. 1509; N. L. R. B. v. Tri-State Casualty Insurance Company, 10 Cir., 188 F.2d 50; United Brotherhood of Carpenters and Joiners v. Sperry, 10 Cir., 170 F.2d 863.

■ Thus, the jurisdictional inquiry here, as in each case where an employer's business is local in character, is whether its activities bear such a close and intimate relation to interstate commerce, or has such a substantial economic effect on such commerce that a work stoppage in the employer's business because of a labor dispute would tend to impede, burden, or obstruct interstate commerce or the free flow thereof. N. L. R. B. v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; Consolidated Edison Company v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; N L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct 668, 83 L.Ed. 1014; N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; N. L. R. B. v. Shawnee Milling Co., 10 Cir., 184 F.

2d 57; N. L. R. B. v. Tri-State Casualty Insurance Company, supra.

■ We think it is apparent that the cessation of any one of respondent's business due to a strike caused by its unfair labor practices would decrease the flow of new automobiles, trucks, parts and accessories into the state of Colorado. A cessation of the respondent's business would not only affect the movement of automobiles into the State but would also have a direct effect upon the interstate activities of their manufacturers, whose production schedule is geared to the needs of their dealers. A stoppage of respondents' business would necessarily affect the manufacturers' production—a cut back in production would in turn affect the interstate activities of those furnishing materials required for such production.

The fact that these dealers are only one of many and that the repercussions of a work stoppage in their business would have relatively little impact on the total flow of the manufacturers' interstate activities is not fatal to jurisdiction. "Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce." Polish National Alliance v. N. L. R. B., supra [322 U.S. 643, 64 S.Ct. 1199, 88 L.Ed. 1509]; N. L. R. B. v. Denver Building & Construction Trades Council, supra; United Brotherhood of Carpenters and Joiners v. Sperry, supra; N. L. R. B. v. Townsend, 9 Cir., 185 F.2d 378. To deny jurisdiction of the Board would allow thousands of retailers of new automobiles to engage in unfair labor practices with impunity. The "total incidence" of such unfair labor practices if left unchecked would not only substantially interfere with the free flow of commerce, but would conceivably bring to a complete standstill the interstate transactions of one of the Nation's greatest industries. See N. L. R. B. v. Townsend, supra.

Since the labor practices of the respondents are admittedly unfair, we conclude that the Board's asserted jurisdiction is proper.

The orders will be enforced.